[Civ. No. 4872. Fourth Dist. Oct. 14, 1954.]

THE PEOPLE, Appellant, v. THE CITY OF CARLSBAD, Respondent.

78

Edmund G. Brown, Attorney General, Gerald F. Carreras, Deputy Attorney General, and Vincent Whelan for Appellant.

T. Bruce Smith for Respondent.

BARNARD, P. J.—This proceeding in quo warranto was brought to test the validity of the incorporation of the city of Carlsbad. The complaint, filed on July 21, 1953, alleged

that the incorporation proceedings were void and ineffective because the notice of the election, as published, was fatally defective in that it did not contain the date of the election nor state the number of inhabitants of the proposed city, as required by section 34320 of the Government Code, and since that notice was not published ''for at least the two weeks prior to the election,'' as required by section 34319. By its answer the defendant admitted that the notice of this election was defective in these particulars, but affirmatively alleged that sufficient notice of the proposed election had been given by other means so that all of the voters within the boundaries of the proposed city had actual knowledge of the election and of its purpose. As a second affirmative defense it was alleged that any defects in these proceedings were cured and validated by the provisions of the Validating Act of 1952 (Second Extraordinary Session of 1952, chap. 31.)

On February 20, 1952, a petition for the incorporation of a described area as a city of the sixth class was filed with the Board of Supervisors of San Diego County. Pursuant thereto, the board adopted a resolution on May 6, 1952, calling an election to be held on June 24, 1952, for the purpose of determining whether the said area should be incorporated as a municipal corporation. This resolution also provided ''that the clerk of this board cause a notice to be published in the Carlsbad Journal . . . stating . . . the number of its inhabitants, the date of election . . .'' etc. On May 22 and May 29, 1952, there was published in the Carlsbad Journal a notice of election on the proposition of the incorporation of the proposed city of Carlsbad. This notice stated, among other things, the purpose of the election, the terms of the ballot, the description of the election precincts, the polling places and election officials, the hours of polling, the electors' eligibility to vote, and the boundaries of the proposed city. This notice did not state the date of said election and did not state the number of inhabitants of said proposed city.

Widespread publicity with reference to the date, place and purpose of said election was given to the residents and voters within the boundaries of the proposed city by various means. (1) On June 13, 1952, the registrar of voters mailed to each registered voter in this area a postcard which, in addition to specifying the precinct number and polling place of such voter, contained the following: ''Proposed City of Carlsbad election Tuesday June 24, 1952. You will be entitled to vote

in this election if you reside within the proposed boundaries of the city of Carlsbad. Polls open from 7 A.M. to 7 P.M.'' (2) The Carlsbad Journal, a weekly newspaper published in the area, had a circulation of 1,050 copies each week within the boundaries of the proposed city. The issues of May 8, 15, 22, 29 and June 5, 12 and 19, 1952, each contained news articles, editorials and advertisements stating the date of said election as well as the purpose and issues involved therein. (3) A newspaper published in Oceanside, adjoining Carlsbad on the north, with a circulation of 725 within the area, contained in its issues of May 15, June 3, June 9, June 17 and June 23, 1952, articles stating the date of the incorporation election as well as its purpose and issues. (4) A ''throwaway'' newspaper published in the area stated in its issues of May 16, June 13 and June 20, 1952, the date of the incorporation election with other matters concerning said election. In addition, the issue of June 20, 1952, set forth on the front page a sample ballot of the election. (5) During May and June, 1952, a house to house campaign was carried on by a large number of volunteer workers in each precinct in the area in question, with the purpose of contacting each qualified elector and registered voter within the proposed city boundaries. In the course of this campaign a circular containing a discussion of the issues and setting forth the date of the election in large print was handed out to the electors contacted. (6) Open public meetings were held on May 20, June 6, and June 16, 1952, which were widely advertised and largely attended, at each of which the issues were discussed, the date of the election stated, and questions asked and answered. Two similar public meetings of Spanish-speaking citizens were also held, at which the date of the election was announced. (7) A great deal of campaign literature on the subject of the proposed incorporation and the election of June 24 was prepared and distributed prior to said date. Among other things, over 3,000 large cards, all of which gave the date of the election and about half of which contained a sample ballot, were printed and copies mailed to R.F.D. and postoffice box holders residing within the boundaries of the proposed city. Also 400 postcards were printed and prepared for mailing, which advocated the election of a candidate for city treasurer and set forth the election date of June 24, 1952. (8) On June 23 and 24, 1952, a campaign was carried out by a group of persons calling each telephone listed in the area and urging all voters to vote in the incor-

poration election on June 24. (9) On June 23, 1952, an airplane flew in circles over the entire area for a period of two hours, at an altitude of 1,000 feet, with a loud speaker making continuous announcements of the election date and the hours during which the polls would be open, and requesting the citizens to vote. (10) On the afternoon of June 23, a motorcade of 20 to 30 automobiles traveled over substantially all the inhabited area of the proposed city for a period of one and a half hours. The first and last automobiles had loud speakers mounted on them through which continuous announcements were made urging the electorate to vote for incorporation on the following day, and specifying the hours during which the polls would be open.

The election was held on June 24, 1952. Thereafter, the board of supervisors canvassed the results of the election and as a result of said canvass declared that 1,541 votes had been cast, 809 votes in favor of such incorporation and 732 votes against such incorporation. On June 24, there were not less than 2,290 and not more than 2,321 registered voters residing within the territory proposed to be incorporated who were entitled to vote at such election. The percentage of qualified electors who voted in said election was not less than 66.4 per cent and not more than 67 per cent of the total number of registered electors within said proposed city. On July 11, 1952, the board of supervisors adopted a resolution declaring the result of said election and ordering and declaring that the territory in question ''be and it is incorporated as a Sixth Class city of the state of California under the name of City of Carlsbad.'' A certified copy of said resolution and order was filed in the office of the Secretary of State on July 16, 1952.

The court found the above facts and further found that by reason of this publicity and the official published notices the pendency of the incorporation election and the date thereof were matters of public notoriety throughout the area proposed to be incorporated; that the question to be voted on and the date of said election were in fact generally known by the qualified electors and registered voters in said area prior to June 24, 1952; that all interested electors actually knew of the date of the election and those caring to vote did vote; that the election held on June 24, 1952, on the question of the incorporation of the proposed city of Carlsbad was an honest election, was honestly and fairly conducted, and the vote cast in said election was a full and fair expres-

sion of the electorate in said area; that the failure of the official published notices to state the date of the election and the number of inhabitants within the area, and the publication of said notices in the fifth and fourth weeks prior to said election did not prejudice the said election and did not affect the result; and that said city of Carlsbad now is and at all times since July 16, 1952, has been exercising each and all of the functions of a municipal corporation of the Sixth Class. In a memorandum decision the court held "that in view of the evidence introduced at the trial, the incorporation is valid and, furthermore, that any defects have been cured by the curative statute." A judgment was entered decreeing that the city of Carlsbad is and has been since July 16, 1952, a municipal corporation of the sixth class and denying any relief to the plaintiff. The plaintiff has appealed from that judgment.

It is contended that certain findings to the effect that actual notice and widespread publicity with respect to the date, place and purpose of said election were given the residents of this area; that certain circulars were distributed; and that house to house calls and telephone calls were made, and certain other details of the findings are not supported by the evidence. These findings are sufficiently supported by the evidence and by the inferences that may reasonably be drawn therefrom. At the beginning of the trial the parties stipulated to practically all of the material facts as found by the court, with the exception of those which relate to the extent and effect of the publicity given and the campaigns carried on, and the validity of the election. The appellant rested on the stipulation of facts and offered no evidence. The respondent introduced considerable evidence with respect to the extent and nature of the publicity and the other campaigns carried on in the district prior to the election, for the purpose of acquainting the voters with the date of the election and the issue to be decided.

The appellant's main contention is that the election was invalid since the published notices of the election failed to give the date of the election and the number of inhabitants, and since they were not published during the two weeks immediately preceding the election, as required by the Government Code. In this connection it is argued that in the absence of the notice required by the statutes no showing of actual knowledge is sufficient unless it shows that each qualified voter had such knowledge, or unless it is established that

those not voting could not have affected the result. Reliance is placed on such cases as *People* v. *City of Glendale,* 40 Cal. 2d 732 [256 P.2d 20]; *People* v. *City of Riverside,* 66 Cal. 288 [5 P. 350]; *Anaheim Sugar Co.* v. *County of Orange,* 181 Cal. 212 [183 P. 809]; *Stumpf* v. *Board of Supervisors,* 131 Cal. 364 [63 P. 663, 82 Am.St.Rep. 350]; and *People* v. *Thompson,* 67 Cal. 627 [9 P. 833].

No complaint is made of the proceedings up to the adoption of the resolution calling for this election. It has been held in many cases that the failure to strictly comply with the statutory requirements, in giving notice of the election, is not necessarily fatal. Most of the cases relied on by the appellant are either cases involving errors or omissions which might well have misled or deceived the electors, or cases where it could not be said, as a matter of law, that the errors or omissions had not prejudiced the right of the electors. In many other cases it has been held that a substantial compliance with the statute is sufficient, and that a failure to strictly comply with all requirements will not vitiate an election unless it is made to appear that the irregularities were such as to have affected the result, or were such as to have prevented the voters from freely and fairly expressing their will at the polls.

In *In re East Bay etc. Water Bonds of 1925,* 196 Cal. 725 [239 P. 38], after reviewing many cases, the court said:

"It is thus apparent that the election itself is the controlling feature and the ultimate objective of the statute. If the election has been honestly and fairly conducted, and no one has been injured by the manner in which the preliminary steps leading thereto have been taken, no reason exists for declaring it invalid. In the instant case there was no evidence offered on the part of the defendants tending to show that they had been prejudicially affected by the procedure which had been adopted and followed leading up to the election. . . .

"The books are filled to overflowing with statements of the rule, in substance, that, wherever possible from a standpoint of legal justice to validate an election, it is the duty of the court to do so."

The general rule is that after an election has been held statutory requirements as to the time and manner of giving notice are directory, unless it appears that the variation has prevented the electors from giving a full and free expression of their will, or unless the statute itself contains

a further provision to the effect that such a variation will render the election void. ▉ The test for determining whether an election is invalidated because of a failure to strictly comply with the notice provisions prescribed by the statute has frequently been stated to be whether the voters generally have had knowledge of the election and full opportunity to express their will, or whether the variance may have affected the result by depriving a sufficient number of voters of the opportunity to exercise their franchise. ▉ It is also usually held that where a considerable deviation appears the burden rests upon the party seeking to uphold the election to show that such variance has not affected the result. (*In re East Bay etc. Water Bonds of 1925,* 196 Cal. 725 [239 P. 38]; *People* v. *Town of Larkspur,* 16 Cal.App. 169 [116 P. 702, 706]; *County of Sonoma* v. *Sanborn,* 1 Cal.App.2d 26 [36 P.2d 419]; *County of Sacramento* v. *Stephens,* 11 Cal. App.2d 110 [53 P.2d 197].

▉ The principles set forth in the cases just cited are applicable here. Assuming that the burden of proof in this regard rested upon the respondent, that burden was successfully met. The question was one of fact for the trial court, and its findings are supported by the evidence. As the trial judge pointed out, the evidence in this regard ''is overwhelming.'' The·date of the election was repeatedly and widely publicized with a cumulative effect far beyond that which would normally follow a mere compliance with the statute. The evidence shows that an unusually vigorous campaign was carried on, and every voter received a notice from the registrar of voters giving the date and place where he was to vote. The failure to state the number of inhabitants in the proposed city could not affect the result. That provision was originally intended to enable the voters to determine in what class the proposed city would fall. Under the facts here, this proposed city could only be one of the sixth class (Gov. Code, § 34114.) The fact that the official publications of the notice were not made during the last two weeks should not be held sufficient to vitiate the election in view of the convincing evidence of the widespread unofficial publicity which followed, and which continued up to the time of the election. The principles above referred to are also applicable to this deviation from the statute.

▉ Moreover, in our opinion, all of the defects in question were cured by the provisions of the Validating Act as found in chapter 31, Second Extraordinary Session of 1952. The

appellant contends that this act is not applicable here for three reasons. The first, that to apply it would constitute special legislation since it would omit the required notice for this one city while requiring it for all other cities, and the second that the requirement for publishing the notice for the last two weeks preceding the election is jurisdictional and one which could not be changed by the Legislature, require no extended discussion and are without merit. As a third reason, it is contended that section 6d of this act provides that it shall not operate to validate or legalize "any act, proceeding, or other matter the legality of which is being contested or inquired into in any legal proceeding now pending and undetermined . . ."; and that the legality of these incorporation proceedings was being contested or inquired into in the case of *Williams* v. *McClellan* which was pending at the time this curative act went into effect. In that action, filed on July 16, 1952, by an individual against the elected members of the city council, it was sought to enjoin the incorporation of the city of Carlsbad on the ground that the defendants were proceeding unlawfully to try to organize a municipal corporation, since the county of San Diego, being a chartered county, constituted a municipal corporation of which the community of Carlsbad was already a part. A judgment on demurrer in that case was affirmed on appeal on the ground that the complaint stated no cause of action, and it was pointed out in the decision that there were no allegations in the complaint purporting to set forth any illegalities or defects in the notices of the incorporation election, or in the proceedings had pursuant to the provisions of the Government Code. (*Williams* v. *McClellan,* 119 Cal. App.2d 138 [259 P.2d 12].)

It seems clear that the purpose of this provision of the Curative Act, so far as material here, was to provide that it should not interfere with any then existing litigation which had been brought for the purpose of determining the validity of any act or proceeding which would otherwise come within the scope of the act. Not only was no cause of action stated in the Williams action which was then pending but that action did not purport to set forth any illegalities or defects in the notices of election or in the proceedings had under the Government Code as such. That action was limited to the one unfounded claim that no proceedings for the incorporation of any city could be maintained in that county because the county itself was a municipal corporation. The legality of

the acts and proceedings here in question, as such, were in no way attacked and we think the pending case of *Williams* v. *McClellan* was not "any legal proceedings now pending and undetermined" within the meaning, intent and purpose of this provision of the Curative Act.

The judgment is affirmed.

Griffin, J., concurred.

A petition for a rehearing was denied November 8, 1954, and appellant's petition for a hearing by the Supreme Court was denied December 9, 1954.